IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21CV345

INNOVATIVE HEALING SYSTEMS, INC., et al., )
)
    Plaintiff, )
)
vs. ) ORDER
)
XPI SERVICES, LLC, )
)
    Defendant. )
_____)

This matter is before the Court upon the Plaintiffs' and Defendant's cross-motions for summary judgment. The motions are fully briefed and ripe for disposition.

## I.    FACTAL BACKGROUND

The facts in this case are undisputed. Plaintiffs Innovative Healing Systems, Inc., Hyperbaric & WoundCare, Inc., and WoundCare MD, Inc. are three related companies that are in the business of operating wound care facilities at hospitals. Dr. Ravi Patel owns Woundcare MD, Inc., which is the parent company of both Innovative Healing Systems, Inc. and Hyperbaric & WoundCare, Inc. All three companies share the same corporate officers and all three do business under the name "Innovative Healing Systems." David DeMik ("DeMik") is the Chief Financial Officer of the three Innovative Healing Systems companies.

Dr. Patel's wound care facilities use hyperbaric chambers to promote healing process. Hyperbaric chambers are medical devices that use pressurized oxygen to deliver therapy to patients. This case is about two of those hyperbaric chambers. From 2012 to 2017, Dr. Patel used those chambers at a medical facility overseas in Dubai. After that clinic closed, the chambers were put into sealed crates, shipped back across the Atlantic, and imported into the United States

for eventual use at a new facility in western Tennessee. Mr. DeMik oversaw the importation of the chambers and was to arrange for them to be transported to their final destination in the United States. In July 2017, Mr. DeMik, acting on behalf of Innovative Healing Systems, contacted Roger Soudir ("Soudir"), the President and Chief Executive Officer of Defendant XPI, a Charlotte-based non-vessel operating common carrier and freight forwarder, to ask whether XPI could assist Innovative Healing Systems with the importation of the chambers. XPI agreed to assist Innovative Healing Systems with the importing phase, including obtaining customs clearance for the chambers.

Mr. DeMik later discussed with Mr. Soudir the need to store the chambers temporarily while Innovative Healing Systems arranged for the chambers to be transported to their final destination.[1] XPI agreed to help Innovative Healing Systems store the chambers and began checking for warehouse availability.[2] In October 2017, Mr. Soudir contacted Tony Albanese ("Albanese"), who owned a company called Cycle Up Supply Chain Services ("Cycle Up"), to ask whether Cycle Up could store the chambers. Mr. Soudir located Cycle Up without any assistance from Innovative Healing Systems. Mr. Albanese told Mr. Soudir that Cycle Up could store the chambers for XPI and that it would cost $400 per month for storage. Mr. Soudir then communicated to Mr. DeMik that he had found a warehouse to store the chambers and that storage would cost $550 per month. Mr. DeMik authorized XPI to proceed with having the chambers stored at the warehouse XPI had located. XPI then accepted Cycle Up's proposal and directed Cycle Up to pick up the chambers from the port after they cleared customs and to have them delivered to Cycle Up's warehouse. Cycle Up followed XPI's directions and began storing

---

[1] The Tennessee facility where the chambers were originally intended to be used was not yet open.
[2] While XPI does not own or operate any warehouses, it does hold itself out on its website as offering warehouse and distribution capabilities.

2

Case 3:21-cv-00345-GCM    Document 38    Filed 01/30/23    Page 2 of 16

the chambers at Cycle Up's warehouse in Savannah. The chambers were stored in the same sealed crates in which they had been shipped from Dubai.

Mr. Soudir asked Mr. DeMik where XPI should send the bill for storage fees. Mr. DeMik responded that the invoices should be sent to Innovative Healing Systems.[3] Cycle Up billed XPI directly for the storage, since Cycle Up's dealings regarding the chambers and their storage were with XPI, not Innovative Healing Systems. When the chambers were first placed into storage, Innovative Healing Systems did not know the identity of Cycle Up, did not know the exact location of the chambers, and did not know that Cycle Up was charging XPI only $400 for the storage of the chambers.

From November 2017 to July 2020, XPI sent monthly invoices to Innovative Healing Systems for a storage fee of $550, even though Cycle Up was only charging XPI a monthly storage fee of $400. According to XPI, it added on a "handling fee of $150" to the total monthly storage fee that it charged Innovative Healing Systems. Innovative Healing Systems timely paid each of the invoices that it received from XPI. XPI, however, failed to pay Cycle Up for over nine months at one point.

In May 2020, Innovative Healing Systems notified XPI that it planned to retrieve the chambers from storage within the next several months. XPI then asked Cycle Up to check on the chambers to ensure that they were still intact as they had been delivered. Cycle Up informed XPI that the chambers were still at the same location at that point. This was the first time that XPI had asked Cycle Up to check on the condition of the chambers since late 2017. XPI never itself inspected the chambers while they were in storage. In July 2020, Innovative Healing Systems

---

[3] Thereafter, XPI sent invoices to "Innovative Healing System" for $550 each month, and denoted that as a "storage fee." Innovative Healing Systems timely paid each of those invoices.

became aware that an individual claiming to be a salvage buyer had contacted Perry Baromedical Corporation[4] to inquire about the value of two hyperbaric chambers with serial numbers matching the chambers that XPI was supposed to be storing for Innovative Healing Systems. This individual reported that he had found the chambers outdoors in a dumpster and exposed to the elements. Mr. DeMik asked Mr. Soudir to investigate the matter. Mr. Soudir later informed Mr. DeMik that the owner (Cycle Up) of the warehouse where the chambers were supposed to be stored believed that the chambers had been stolen during a move from one warehouse to another. This was the first time Innovative Healing Systems became aware of Cycle Up's identity and the arrangement between XPI and Cycle Up regarding the storage of the chambers. Innovative Healing Systems ultimately learned that the chambers had been left outside Cycle Up's old warehouse, out of their crates, and exposed to the elements. It remains unknown exactly how the chambers got there.

After recovering the chambers, Innovative Healing Systems had the damage to the chambers assessed by an expert. It was determined that the chambers were so damaged that the total cost to repair them exceeded the cost to purchase replacement chambers of comparable quality.[5]

Plaintiffs have asserted claims against XPI for breach of bailment, breach of contract, negligence, and unjust enrichment. (Am. Compl. ¶¶ 45–75, ECF No. 23). They have moved for summary judgment as to each of their claims.[6] Defendant XPI likewise moves for summary judgment in its favor as to each of Plaintiffs' claims.

---

[4] Perry Baromedical Corporation had acquired the hyperbaric division of the original manufacturer of the chambers.
[5] It was determined that the total cost to replace the chambers with those of comparable quality and features was $308,179.44, while the cost to repair was estimated at $386,350.00.
[6] Plaintiffs are moving for summary judgment on their unjust enrichment claim in the alternative.

4

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the case. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (citations omitted).

### B. Breach of Bailment

Under North Carolina law, "[a] bailment is created upon the delivery of possession of goods and the acceptance of their delivery by the bailee." *Atl. Contracting & Material Co. v. Adcock*, 588 S.E.2d 36, 39 (N.C. Ct. App. 2003) (quoting *Flexlon Fabrics, Inc. v. Wicker Pick-Up & Delivery Serv., Inc.*, 250 S.E.2d 723, 726 (N.C. Ct. App. 1979)). "[T]ransactions constituting bailments include 'the delivery and acceptance of custody of personal property for safekeeping, transportation, or storage.'" *Id*. at 40. (quoting 8A Am. Jur. 2d *Bailments* § 5 (1997). "When a bailment is created for the benefit of both the bailor and bailee, the bailee is required to exercise ordinary care to protect the subject of the bailment from negligent loss, damage, or destruction." *Barnes v. Erie Ins. Exch.*, 576 S.E.2d 681, 683–84 (N.C. Ct. App. 2003).

Delivery occurs when the "bailor relinquish[es] exclusive possession, custody, and control to the bailee." *Flexlon Fabrics*, 250 S.E.2d at 726. "An acceptance is established upon a showing directly or indirectly of a voluntary acceptance of the goods under an express or implied contract to take and redeliver them." *Id.* The delivery and acceptance requirements of a bailment

5

are met when a bailee's agent accepts delivery of possession of the property. *See*, *e.g.*, *id*. (determining that there was "ample evidence of delivery and acceptance . . . to establish a bailment" where the "[d]efendant, through its agents, . . . voluntarily and knowingly accepted exclusive control of the" property); *see also* 8A Am. Jur. 2d *Bailments* §§ 41, 44, Westlaw (database updated Jan. 2023) (explaining that delivery and acceptance can be completed through the bailee's agent). Plaintiffs argue that the undisputed facts establish that the parties created a mutual benefit bailment for the storage of the chambers and that XPI failed to exercise ordinary care to protect the chambers from damage.

XPI contends that no bailment existed between Plaintiffs and XPI because at the time the alleged bailment was created the chambers were still owned by Dr. Patel.[7] Plaintiff Hyperbaric and Woundcare, Inc. acquired ownership of the chambers from Dr. Patel via a bill of sale dated October 19, 2017.[8] However, the exact date Hyperbaric and Woundcare, Inc. acquired ownership of the chambers and the date the agreement between Plaintiffs and XPI was entered into is of no consequence. A bailor "need not have absolute title to the thing bailed, provided the bailor is invested with such possessory interest as will entitle the bailor to hold it against all the world except the rightful owner." 8A Am. Jur. 2d *Bailments* § 30, Westlaw (database updated Jan. 2023) (citations omitted)); *see also* 8 C.J.S. *Bailments* § 26, Westlaw (database updated Nov. 2022) ("It is not essential that a bailor have an absolute title to the subject matter of the bailment, as it suffices that the bailor is vested with a possessory interest in the subject matter that will

---

[7] In support of its argument that a plaintiff must be the owner of the property in order to create a bailment XPI cites the North Carolina Pattern Jury Instructions on bailment. However, a "pattern jury instruction . . . has neither the force nor the effect of law." *State v. Warren*, 499 S.E.2d 431, 453 (N.C. 1998).

[8] While it is disputed as to when the agreement between XPI and Plaintiffs was actually formed, XPI's first invoice to Plaintiffs indicated that it covered a "Storage Fee" for "Monthly – Oct 19, 2017 to Nov 19, 2017)." (DeMik Decl. Ex. A, at p. 8, ECF No. 29-4). Coincidentally, this is the same day that ownership of the chambers transferred from Dr. Patel to Hyperbaric & WoundCare, Inc. (ECF No. 19-8).

entitle the bailor to assert her interest against all the world except the rightful owner."). Moreover, in North Carolina a possessory interest is a recognized property interest. *See Dunbar Corp. v. Lindsey*, 905 F.2d 754, 757–58, 760 (4th Cir. 1990).

The Court finds that Plaintiffs have produced undisputed evidence of a possessory interest in the chambers sufficient to form a bailment. First, Hyperbaric & Woundcare, Inc. was the owner of the chambers during the period when they were in storage. WoundCare MD, Inc., as Hyperbaric & Woundcare's parent, also had a possessory interest in the chambers during that same period and is likewise entitled to seek damages. Mr. DeMik's deposition testimony and declaration establish that Innovative Healing Systems, Inc. is the administrative arm of all three entities doing business as Innovative Healing Systems, including Hyperbaric & WoundCare, Inc. (the owner of the chambers). (DeMik Dep. 103:12–19, ECF No. 29-2; DeMik Decl. ¶ 5, ECF No.18- 4). In this administrative role, Innovative Healing Systems, Inc. had authority to make decisions relating to the importing, storage, and transportation of the chambers and to take possession of the chambers once they arrived in the United States. (DeMik Decl. at ¶ 9, ECF No. 18-4; Patel Decl. ¶ 9, ECF No.18-5; Patel Dep. 27:1–15, ECF No. 18-3). Accordingly, even if Innovative Healing Systems, Inc. did not have legal title to the chambers, it nevertheless had a valid possessory interest in the chambers that permitted it to form a bailment with XPI.[9]

XPI next argues that no bailment existed because the chambers were not delivered to XPI and XPI did not have exclusive possession and control of the chambers. However, the fact that Cycle Up had physical possession does not mean that no bailment was formed if Cycle Up was acting as XPI's agent. *See Flexlon Fabrics,* 250 S.E.2d at 726 (determining that there was

---

[9] Alternatively, the Court finds that XPI is estopped from denying that Innovative Healing Systems, Inc. had a possessory interest in the chambers, as it never questioned Innovative Healing Systems, Inc.'s authority to enter into any agreements with XPI relating to the importing and storage of the chambers, and instead accepted payment from Innovative Healing Systems for storage for almost three years.

7

"ample evidence of delivery and acceptance . . . to establish a bailment" where the "[d]efendant, through its agents, . . . voluntarily and knowingly accepted exclusive control of the" property); 8A Am. Jur. 2d *Bailments* §§ 41, 44, Westlaw (database updated Jan. 2023) (explaining that delivery and acceptance of property subject to a bailment can be completed through the bailee's agent).

There are "two essential ingredients in the principal-agent relationship: (1) authority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Holcomb v. Colonial Assocs., L.L.C.*, 597 S.E.2d 710, 716 (N.C. 2004) (quoting 24 Strong's North Carolina Index 4th *Principal and Agent* § 1 (1993)). The Court finds that Plaintiffs have produced undisputed evidence of both these elements.

First, it is undisputed that XPI located and selected Cycle Up to store the chambers and that Cycle Up dealt exclusively with XPI and never with Plaintiffs. XPI contends that Cycle Up did not have the authority to do anything on behalf of XPI. According to the uncontested declaration of Tony Albanese (Cycle Up's owner) and XPI's own deposition testimony, Cycle Up transported the chambers and stored them at Cycle Up's facility—all at the request and direction of XPI. (XPI Dep. 53:8–54:23, ECF No.18-6; Albanese Decl. ¶¶ 3–7 & Ex. A, ECF No. 18-7). Cycle Up sent monthly invoices to XPI. (XPI Dep. 53:18-54:15; Albanese Decl. ¶ 7 & Ex. B). In fact, Cycle Up never had any dealings or otherwise communicated with Innovative Healing Systems and was not even aware of Innovative Healing Systems' identity until July 2020, years after XPI engaged Cycle Up. (XPI Dep. 55:24–56:3; Albanese Decl. ¶¶ 5–6, 13.)

XPI also had sufficient control over both Cycle Up and the chambers, as evidenced by the declaration of Tony Albanese, Cycle Up's owner:

> XPI Services retained control over the equipment. Had XPI Services given us any specific instructions regarding the equipment and how to handle its storage, Cycle

8

> Up would have followed those instructions. Cycle Up did not at any point believe that it had superior control over the equipment and its storage or otherwise attempt to exercise any such control.

(Albanese Decl. ¶ 10).

Based on similar facts, the North Carolina Supreme Court held that an agency relationship existed between the defendant and a nonparty in a bailment case. *See U.S. Helicopters, Inc. v. Black*, 347 S.E.2d 431, 433 (N.C. 1986). In this case the plaintiff chartered a helicopter to the defendant for use in flying lessons. *Id*. at 432. Although plaintiff had a regular instructor that it offered for those lessons, defendant insisted on using a friend, Ron Manning, who was also a qualified instructor. *Id.* While Mr. Manning was piloting the helicopter just above the ground, the helicopter crashed. *Id*. at 432.

At trial, the plaintiff introduced evidence that Mr. Manning had been negligent. *Id*. at 432-33. The Court of Appeals held that this evidence failed to show that the defendant had himself been negligent. *Id.* The North Carolina Supreme Court reversed, finding that Mr. Manning was defendant's agent and holding that "the rule in North Carolina is that a bailee is liable not only for the results of his own negligence but also for that of his agents." *Id*. at 433 (citing *Vincent v. Woody*, 76 S.E.2d 356 (N.C. 1953)).

Innovative Healing Systems, like the helicopter company, entrusted its property—two hyperbaric chambers—to XPI for safekeeping, just as U.S. Helicopters entrusted its helicopter to Mr. Black. XPI, even though it advertises as offering "warehousing services," chose to hire an agent, Cycle Up, to perform the actual storage. This is much like Mr. Black's choice to hire an agent, Mr. Manning, to assist with his flying lessons. Whether it was XPI's negligence or Cycle Up's negligence that led to the chambers being uncrated and exposed to the elements, XPI as the bailee is responsible.

XPI counters that Cycle Up was an independent contractor, not an agent of XPI. In support of its argument, XPI relies on the eight factors outlined in *McKenzie v. Charlton*, 822 S.E.2d 159 (N.C. Ct. App. 2018) that distinguish an independent contractor from an employee. The Court finds these factors inapplicable in determining whether a general agency relationship existed between XPI and Cycle Up. *Compare McKenzie*, 822 S.E.2d at 162 (stating that the eight factors are considered "in determining whether one acts as an employee or as an independent contractor"), with *U.S. Helicopters*, 347 S.E.2d at 433–34 (analyzing whether a non-party was the defendant bailee's agent without considering the eight factors), and *Wyatt v. Walt Disney World Co.*, 565 S.E.2d 705, 710 (N.C. Ct. App. 2002) (evaluating, in a personal jurisdiction case, whether a company was the agent of the defendants without considering the eight factors).

XPI next argues that even if an agency relationship existed between it and Cycle Up, Cycle Up's actions occurred outside the scope of its alleged authority and thus cannot be imputed to XPI. It is undisputed that XPI arranged for Cycle Up to store the chambers; accordingly, Cycle Up had broad authority to store the chambers. It is apparent from the monthly invoices Cycle Up sent to XPI that it had authority for "warehouse charges" (ECF No. 29-8 at pp. 9–44). Thus, any actions that Cycle Up took while storing the chambers were directly linked to the broad authority that XPI conferred upon Cycle Up when XPI tasked Cycle Up with storing the chambers. *See Vaughn v. N.C. Dep't of Hum. Res.*, 245 S.E.2d 892, 896 (N.C. Ct. App. 1978) (determining that there was a "direct link" between the agent's conduct and the agent's authority to act on behalf of the principal such that the agent's conduct was within the scope of his authority).

Based upon the foregoing, the Court finds that a bailment was formed when XPI, through its agent, Cycle Up, accepted delivery and possession of the chambers for storage.

## C. Negligence

Where, as here, a negligence claim is based on an underlying bailment, courts will analyze and resolve the negligence claim and any accompanying breach of bailment claim together. *See*, *e.g.*, *Rush Indus., Inc. v. MWP Contractors, LLC*, No. 1:08CV810, 2011 WL 13076759, at *3–4 (M.D.N.C. Mar. 3, 2011), *aff'd*, 539 F. App'x 91 (4th Cir. 2013); *see also* 46 Am. Jur. *Proof of Facts 3d* 361, at Part I.B., § 7, Westlaw (originally published in 1998) ("When bailed property is damaged, lost or stolen, the bailor may bring an action for recovery of damages from the bailee based on breach of bailment, negligence or both.").

The North Carolina Supreme Court has held:

> [W]hen a bailor . . . offers evidence tending to show (1) that the property was delivered to the bailee, (2) that bailee accepted it and therefore had possession and control of the property, and (3) that bailee failed to return the property, or returned it in a damaged condition, a prima facie case of actionable negligence is made out and the case must be submitted to the jury. When a prima facie case is made out, it warrants but does not compel a verdict for plaintiff. The jury is simply authorized to find either way, and either party may lose if he offers no further proof.

*Clott v. Greyhound Lines, Inc.*, 180 S.E.2d 102, 110 (N.C. 1971).

The Plaintiffs have established that a bailment existed, and it is undisputed that XPI returned the chambers in a damaged condition. Therefore, Plaintiffs have made a prima facie showing of negligence. While "the presumption of negligence does not entitle plaintiff to a directed verdict if defendant fails to produce evidence of his own due care, defendant risks an adverse jury verdict if it fails to introduce evidence of its own due care." *Flexlon Fabrics*, 250 S.E.2d at 726. When, as here, the record leaves the cause of damage unexplained, the plaintiff is entitled to have the case submitted to the jury for resolution. *Id*. Accordingly, the Court denies summary judgment on the claim of negligence and will proceed to leave this fact-finding to the jury.

11

### D. Breach of Contract

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). It is undisputed that Mr. DeMik and Mr. Soudir agreed that XPI would arrange for and handle the storage of the chambers after they cleared customs. When they finalized that arrangement, Mr. Soudir wrote to Mr. DeMik: "I need to send you the invoice for the customs inspection fees and for Warehouse storage. Could you please let me know who should I bill this to." (Second DeMik Decl. ¶ 15 & Ex. C, ECF No. 29-6). Mr. DeMik responded that Mr. Soudir should send the invoices to "Innovative Healing Systems." *Id*. Each of XPI's invoices was then addressed to "Innovative Healing System (sic)." (DeMik Decl. Ex. A, ECF No. 29-4). Pursuant to this agreement, Innovative Healing Systems paid XPI a monthly storage fee of $550 for almost three years. This arrangement constitutes an enforceable contract for the storage of the chambers. XPI thus breached an express term of the parties' contract by failing to safekeep the chambers while they were in XPI's custody, as demonstrated by the extensive damage to the chambers.

XPI contends that any contract between it and Plaintiffs was merely for locating a storage facility for the chambers and arranging for their transportation to the warehouse, and not for XPI to actually store them. Thus, there can be no breach of any term of the agreement. The evidence shows otherwise. After XPI located a warehouse and arranged for transportation of the chambers to that warehouse, the next communication from Mr. Soudir stated: "Hi Dave, I need to send you the invoice for the customs inspection fees and for *Warehouse storage*. Could you please let me know who should I bill this to?" (ECF No. 29-6, Ex. C) (emphasis added). The invoices (prepared by XPI) expressly state that the service that XPI was providing and charging Innovative Healing Systems for monthly was the "Storage" of the chambers. (ECF No. 29-4, Ex.

12

A). "When the language of a contract is clear and unambiguous, construction of the contract is a matter of law for the court." *Hagler v. Hagler*, 354 S.E.2d 228, 234 (N.C. 1987). "It is a well-settled principle of legal construction that '[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean.'" *Id*. (quoting *Hartford Acc. & Indem. Co. v. Hood*, 40 S.E.2d 198, 201 (N.C. 1946)). The plain meaning of the term "storage" encompasses "the safekeeping of goods in a depository (such as a warehouse)." *Merriam-Webster Dictionary*, www.merriam-webster.com/dictionary/storage (last visited January 27, 2023).

Moreover, the Court notes that if, as XPI now contends, its role ended when the chambers were delivered to Cycle Up's warehouse, XPI would have arranged for Cycle Up to send its invoices directly to Plaintiffs. Instead, XPI send 34 monthly invoices to Plaintiffs for a "Storage Fee," which included a $150 markup.

Defendant also argues that not all the Plaintiffs are parties to any contract. XPI contends it was unaware that Innovative Healing Systems was the business name used by all three entities and understood that the party with whom it was dealing was Innovative Healing Systems, Inc. However, the invoices were not addressed to Innovative Healing Systems, Inc., nor did Mr. DeMik ask XPI Services to address them as such—he asked XPI to address them to "Innovative Healing Systems." (ECF No. 29-6, ¶ 15 & Ex. C). All three plaintiffs do business as Innovative Healing Systems. The natural inference is that all three plaintiffs were parties to the agreement with XPI and are entitled to enforce it following XPI's breach.[10]

---

[10] Plaintiffs argue that even if Hyperbaric & Woundcare, Inc. and Woundcare MD were not direct parties to the contract with XPI, they are entitled to enforce the contract as third-party beneficiaries. The Court finds it unnecessary to address this argument given its determination that all three Plaintiffs may enforce the contract directly.

Innovative Healing Systems, Inc., as the operating company, cut the checks that it sent to XPI for the storage fees. *Id.* at ¶ 17. Hyperbaric & Woundcare, as the owner of the chambers, was a party to the contract for their storage. And WoundCare MD, Inc., as the parent company doing business as Innovative Healing Systems, would also have been entitled to enforce the contract. The North Carolina Court of Appeals has found that tightly related companies, even if they have different legal names, can be considered one and the same for purposes of enforcing a contract. *Manpower of Guilford County, Inc. v. Hedgecock*, 257 S.E.2d 109, 114 (N.C. Ct App. 1979) (rejecting argument that contract was unenforceable by plaintiff because the contract's face said "Manpower, Inc.," an entity different from "Manpower of Guilford County, Inc.").

The undisputed facts show that Plaintiffs entered into a contract for storage with XPI, and that XPI breached that contract by failing to return the chambers in the condition which they had been delivered.

### E. Unjust Enrichment

Plaintiffs have moved for summary judgment on their unjust enrichment claim in the alternative should the Court conclude there was no contract between the parties. Given the Court's determination as to Plaintiffs' breach of contract claim, there is no need for the Court to address this claim.

### F. Damages

Plaintiffs are seeking replacement cost as well as other incurred costs as damages. XPI argues that replacement cost is an inappropriate measure of damages and that the proper measure is the fair market value of the chambers before they were damaged versus after the damage.

While the general rule for "the measure of damages for injury to personal property is the difference between the market value of the damaged property immediately before and

immediately after the injury," the North Carolina Supreme Court has recognized that the rule should be "applied with caution, and often with modifications designed to relax its rigidity and fit it to the facts of the particular case." *Carolina Power & Light Co. v. Paul*, 136 S.E.2d 103, 104 (N.C. 1964). "When no market exists for the property, as can occur when the property is custom made or has been destroyed, courts often determine its value based on the amount paid for the property in the most recent transaction for it (not arising from a settlement)." *Weener Plastics, Inc. v. HNH Packaging, LLC*, 590 F. Supp. 2d 760, 766 (E.D.N.C. 2008). Courts may also award damages based on the replacement value of the property when no market exists for it. *See id.* (collecting authorities supporting the use of replacement cost of property as an appropriate measure of damages, including in bailment cases); 8A Am. Jur. 2d *Bailments* § 254, Westlaw (database updated Jan. 2023) (explaining that "where the goods are unique and their market value is therefore difficult to ascertain, damages for breach of the bailment may be awarded using another reasonable calculation of value such as their replacement cost.").

Plaintiffs have produced expert evidence from the Executive Director of the Undersea & Hyperbaric Medical Society, John Peters, that the chambers are unusable in their current condition. (Peters Decl. Ex. A, ECF No. 29-11). Mr. Peters explained that the only way to repair the chambers would require "custom manufacture" of replacement components. *Id*. Further expert evidence from Mary Pat Finn, president of Perry Baromedical, states that the chambers are unique pieces of complex medical equipment that cannot be safely used in their current condition. (Finn Decl. ¶ 11–12, ECF No. 29-9). The Plaintiffs' CEO, Catherine Todorovich, testified in her deposition that the secondary market to purchase used hyperbaric chambers was "very limited." (Todorovich Dep. 87:15–17, ECF No. 29-12), *see also id*. at 76:1–3 ("Here, in the United States, there isn't much of a secondary market for chambers because they're not

15

readily available"). She also testified that she was not aware of clearing houses or auction houses where large numbers of chambers were for sale. *Id*. at 88:19–22. Ms. Todorovich also testified that used hyperbaric chambers are "very difficult to find." *Id*. at 88:13–18.

Thus, Plaintiffs have produced some evidence that the chambers may be unique and that there may not be a secondary market for them. However, they have not established that there exists *no* market for them. Moreover, there is conflicting evidence with regard to the market value of the chambers as evidenced by their most recent transaction price. Accordingly, the Court declines to grant summary judgment as to the issue of damages.

IT IS THEREFORE ORDERED THAT Defendant's Motion for Summary Judgment is hereby DENIED, and Plaintiffs' Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART such that the claim for negligence and the issue of damages will be decided at trial.

Signed: January 30, 2023

Graham C. Mullen
United States District Judge